The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner and upon the briefs and argument of counsel and the additional evidence submitted pursuant to the Commission's 29 November 1994 Order. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
Based upon all of the competent evidence in the record, the Full Commission rejects the findings made by the Deputy Commissioner and makes the following:
FINDINGS OF FACT
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the plaintiff and the defendant-employer.
3. Aetna Life Casualty Insurance Company was the carrier on the risk.
4. Plaintiff's average weekly wage is as set forth on the Form 22 Wage Chart and is $298.37, resulting in a compensation rate of $198.93 per week.
5. Plaintiff was employed by defendant-employer from 1985 through 1991. He complained that dust and chemicals from a certain type of particle board caused severe problems with his breathing and significantly contributed to his total and permanent disability. This claim was filed by Mr. Everett Norris on a Form 18 alleging total disability due to lung disease related to exposure to dusts and fumes in his employment in the furniture industry. Mr. Norris was employed by Myrtle Desk Company in Chadbourn.
6. At the hearing, Mr. Norris testified, as did two co-workers who corroborated and expanded upon the plaintiff's testimony. Depositions were taken of Dr. Ron Smith and Dr. William Credle, who both treated Mr. Norris.
7. The plaintiff, Everett Lee Norris, was 57 years old at the time of the hearing, had a fifth grade education and could barely read and write. Since 1954, he had been employed in various jobs prior to his employment at Myrtle Desk, which began in January 1985. Mr. Norris worked for Myrtle Desk in the factory in Chadbourn setting up machinery, and then working on the assembly line producing furniture.
8. The desks that Mr. Norris worked on were made from a material which was variously referred to as "pasteboard", "particle board", and "MFD Board". The witnesses consistently described the material as being made out of small particles of wood fiber held together with some form of glue or chemical. The machines also ran regular lumber at times.
9. Mr. Norris and the co-workers, Mr. Thompkins and Ms. Norris (no relation to plaintiff) described a very dusty operation, in which the machine cut the boards, creating a great deal of dust. Mr. Norris worked primarily on the dovetail machines. These machines had dust collecting systems which, according to the witnesses, were not effective in collecting the dust. Mr. Norris described the dust as a very fine powder which blew all around "just like a smoke." There were paper masks available, but Mr. Norris testified that if he wore one, it would get stopped up so that he was not able to wear it longer than about five or ten minutes. Within an hour he would be covered with dust, and had to take off his glasses every five or ten minutes to clean them off in order to see. By the end of the day, he was covered with dust all over his clothes, and throughout the day had to blow his nose frequently. This testimony was consistent with that of the co-workers, who described the same conditions. According to these witnesses, the conditions in the plant did not change throughout the time that Mr. Norris worked there from 1985 to 1991. The dusty conditions described in the testimony subjected plaintiff to a greater risk of contracting chronic obstructive pulmonary disease and a greater risk of contracting occupational asthma than members of the general public.
10. Mr. Charles Thompkins testified that he worked at Myrtle Desk for a year and nine months beginning when the plant opened in 1985. He worked near the same machines that Mr. Everett Norris worked on, and described the dust as "a lot of that there fine dust." He also testified that the dust was so constant that he had to wipe off his glasses every four or five minutes, and that he could not wear a mask because it would get so full of dust that you could not wear it. He described having to blow off the machine and his clothes every ten or fifteen minutes because it would be so dusty. Mr. Thompkins described the particle board dust as much finer dust than regular wood. Mr. Thompkins himself worked on machines which usually ran regular lumber rather than particle board, but noticed that the dust from regular lumber was not nearly as bad as the dust from the particle board. In addition, Mr. Thompkins recalled that the particle board was basically sawdust glued together, and that the dust also had a glue smell.
11. Ms. Doris G. Norris testified that she worked for Myrtle Desk beginning in 1985 for a period of six years. She worked assisting on the French dovetail machine, and described the conditions as "terrible." According to Ms. Norris, the dust from the machine was so bad that the person at the next machine put up a partition to keep the dust from getting on her, which made all the dust blow back on Ms. Norris and the plaintiff. Ms. Norris also described cleaning off her safety glasses every five or ten minutes, and being unable to wear a mask because the dust was so thick it would clog it up. After working on the machine for a while, Ms. Norris began going to the doctor at least twice a month, and her doctor told her to quit the job because it was causing her to have a terrible hacking cough and difficulty breathing. She described her breathing as getting gradually worse during the course of the work week, and that it would then improve over the weekend and would then worsen again when she came back in on Monday and starting working on the machine again. Ms. Norris left her employment at Myrtle Desk in 1990, and has not had breathing trouble since that time. At the time of the hearing, Ms. Norris was 38 years old.
12. Mr. Ron Jarrell testified on behalf of the defendant, as the manager of the Myrtle Desk Company in Chadbourn. He testified that he knew the plaintiff Mr. Norris well, and that he had known him before he worked at Myrtle Desk Company. Mr. Jarrell did not actually work on the machines that were run by the plaintiff and the other witnesses, and acknowledged that there was dust in the area. He acknowledged that the French dovetail machine created a little more dust than some others, and corroborated the testimony that the partition was put up between that machine and the next machine to keep the dust off of the co-workers. Mr. Jarrell did not dispute the testimony of Mr. Norris or his co-workers to the extent that there were accumulations of dust from the dovetail machine which were worse than in some other parts of the plant.
13. Dr. Ron Smith, the plaintiff's family physician, testified that he saw Mr. Norris for he first time in December of 1986, almost two years after Mr. Norris began working for Myrtle Desk. At that time, Mr. Norris was diagnosed as having asthmatic bronchitis, and was told to return in January of 1987 for follow-up. Dr. Smith did not see Mr. Norris again for about a year. As of January 16, 1987, according to Dr. Smith "there was no evidence of COPD (chronic obstructive pulmonary disease) on X-ray at that time."
14. When Mr. Norris returned to Dr. Smith in April of 1988, it was recommended that he be referred to the Chadbourn Allergy Clinic, but his notes did not indicate that there was an allergy report. In September of 1988 Mr. Norris returned complaining of worsening of his shortness of breath with wheezing and a raspy cough. At that time, Mr. Norris discussed the dust exposure at work. Dr. Smith made a diagnosis at that time of a chronic lung condition of unknown cause. From that time up through the end of 1990, the frequency of Mr. Norris' visits increased, and he was essentially given medication for his breathing and for the recurrent lung infections that came along with it.
15. By November of 1990, Mr. Norris reported to Dr. Smith that he was having more difficulty breathing, and with wheezing and cough, and that he had discovered that his symptoms were worse when he was at work. Mr. Norris' breathing continued to worsen through November of 1991, and he was not responding to the medication and was hospitalized near the end of January 1991. At that time he was diagnosed with COPD. By January 28, 1992, Dr. Smith was of the opinion that Mr. Norris was unable to work in the dusty environment at Myrtle Desk, and was not able to wear a mask because of his lung disease. After January of 1991, Mr. Norris did not return to work, and continued under frequent treatment by Dr. Smith, who referred him to Dr. William Credle in Wilmington. Dr. Credle agreed with the course of treatment, which continued. In July of 1991, Dr. Smith saw Mr. Norris and found at that time that he was not wheezing, and was "three times better than he had been since he was working." Mr. Norris had also quit smoking by that time.
16. By the time of the deposition in February 1993, Dr. Smith was of the opinion that Mr. Norris had chronic lung disease with an asthmatic component. Dr. Smith was not sure of the originating cause of the lung disease in Mr. Norris, but was very definite that Mr. Norris' exposure to dust in plant "definitely made him worse. It increased the progression of his disease, and it really aggravated this asthmatic component to his disease." Dr. Smith also expressed the opinion that contaminants in the air such as the dust in Mr. Norris' employment "would generally create or cause chronic lung disease," just as cigarette smoking would do.
17. According to Dr. Smith, Mr. Norris is totally disabled because of his lung disease, will require on-going medical attention for the rest of his life, and has been totally disabled since January 28, 1991. On cross examination, Dr. Smith explained that when Mr. Norris first came to see him he had a cough and congestion with slightly reduced lung function. With treatment, the pulmonary functions went back up over time and with continued exposure to the wood dust, Mr. Norris' disease progressed faster than it might normally, and resulted in an irreversible condition by January of 1991. Dr. Smith's opinion overall was that Mr. Norris had an asthmatic condition (reversible) in 1988, and that the exposure to wood dust at Myrtle Desk was a causal factor in the disease progression. Progression has been so severe that the disease is now irreversible, Mr. Norris is now on home oxygen, and is totally and permanently disabled.
18. Dr. William F. Credle, a pulmonary specialist from Wilmington, also testified in this matter. Dr. Credle saw Mr. Norris in January of 1991 on referral from Dr. Ron Smith. At that time, Mr. Norris gave a history of having had breathing trouble off and on for three years and having a history of being a smoker and of working in a furniture plant around a lot of dust and fumes. The essence of Dr. Credle's testimony was that he expressed the opinion that Mr. Norris' exposure to dust and fumes in his employment significantly contributed to the asthmatic component of his lung condition, but that he did not feel that the exposure was the cause of his chronic obstructive pulmonary disease. Dr. Credle testified that he was under the impression that "I'm not aware of dust o[r] particle board fumes being a cause of chronic obstructive pulmonary disease. There is no medical evidence of that."
19. It was this testimony that led the Commission to ask for further evidence, since counsel for the plaintiff indicated that "vast quantities of medical literature" dispute the doctor's statement.
20. Dr. Douglas S. Campbell testified subsequently about his review of the medical literature. Prior to reviewing the literature, however, he reviewed the transcript of a deposition of Mr. Norris and transcripts of depositions of some of his treating physicians, and some medical records from some of his treating physicians and said that the information he reviewed was similar to the type of information that he would have elicited had he talked to the persons himself.
21. Dr. Campbell's understanding of Mr. Norris' occupational exposure situation at the Myrtle Desk was as follows. He started working at Myrtle Desk in January of 1985, doing a setup job where he was setting up equipment to be used; and starting in March of 1985, he began working in the production process of making types of furniture using a type of wood called medium-density fiberboard, which is abbreviated MDF. He worked on a process where he worked with a French dovetail equipment. He worked there from March of 1985 until January of 1991. During that time, he was in a room that was filled up with dust from the process; and there was extensive dust exposure in the air during a lot of that time.
22. Dr. Campbell rendered an opinion, and the Full Commission finds as a fact, that Mr. Norris' work and exposure at Myrtle Desk placed him at increased risk for development of chronic lung disease than members of the public generally.
23. In reaching this opinion, Dr. Campbell considered the following. Mr. Norris had no respiratory complaints prior to working at Myrtle Desk. Then, after he had been there a while, beginning sometime in the latter part of 1986, he started having breathing problems where he would get sick — he would have breathing problems going in the first part of the week. It would get worse during the week, and then over the weekend, his symptoms would improve. Then, when he would go back to work the next week, his symptoms would come back again, which is very suggestive of a workplace-related respiratory problem. His symptoms continued from 1986 until 1991 when he quit working there and had to remain at home on home oxygen. He had about a four- to five-year history of symptoms while he was still working. That gives a time course which is suggestive of an occupation-related illness. He also has developed a tendency to have respiratory problems when exposed to non-specific irritants like cooking fumes, which is consistent with an occupational asthma. He developed a non-specific airway irritability to airborne exposures.
24. Occupational asthma is asthma that is ascribed to an occupational exposure, and there are several components of it. The definition includes a time course where initially the employee is not having respiratory symptoms, followed by a period when he starts to have symptoms at the workplace or related to the workplace. Symptoms get worse with exposure to the workplace and get better when the employee is away from the workplace, particularly away from the workplace for several days.
25. Occupational asthma is a non-specific type of respiratory illness where the patient responds to things other than the workplace, because asthma is a non-specific bronchial airway irritability. Pulmonary function tests that show a reversibility of obstruction also support occupational asthma.
26. In the course of occupational asthma, there can come a time when the reversibility goes away and it becomes irreversible. If a person is exposed for long enough, it becomes less and less reversible. The longer the exposure goes on, the less likely it is to have a complete reversibility. This type of occupational asthma can get to the point where there is some obstructive lung disease of a permanent nature.
27. Dr. Campbell's review of the medical literature revealed the following. One was Hunter's Diseases of Occupations, and it lists wood dust as a cause of occupational asthma. It also talks about formaldehyde as a source. This is also supported in ZenzTextbook of Occupational Asthma. This talks briefly about occupational asthma, and then talks about some of the possible causes of occupational asthma. On Page 474, it discusses wood dust as a cause of occupational asthma.
28. With respect to formaldehyde, Dr. Campbell testified, "The way I understand the material that he (Mr. Norris) was working with, this fiberboard, it's a product composed of wood products often gotten from a plant that wants to use their waste. So, they go to the waste — things like sawdust or used wood. They mix this with a urea formaldehyde combination as well as a wax, a paraffin type of wax. Then they put it — for this particular product, they put it into a digesting process that makes the — like, the sawdust become more of a fiber, and this gives a more consistent texture to the finished product. Then they put it — I think they put it in a heat treatment and — so that the end product has wood as well as urea formaldehyde and a wax."
29. Dr. Campbell testified that he then went to the medical literature to see if formaldehyde and wood dust exposures had good literature to support there being a cause of occupational asthma. For formaldehyde, there was an article in The Journal of Allergyand Clinical Immunology, 1985, Volume 75, page 91 through 99. The title is "Formaldehyde Asthma: Rare or Overlooked?"
 "They took two hundred and thirty (230) persons who had been exposed to formaldehyde and reporting symptoms, and tested them for the presence of asthma. Of those, they found twelve (12) who they concluded had asthma related to formaldehyde exposure, and it met the criteria of asthma for them. They conclude that there is a formaldehyde asthma that they call rare, but they feel is under-reported; that it is not reported enough in the literature. They found about a five percent (5%) occurrence in these persons that they investigated. Then, there is an article in the Archives of Environmental Health. It's 1990, Volume 45, pages 288 through 294, which is a study of persons who work with plywood and were occupationally exposed to formaldehyde. The title is Respiratory Health of Plywood Workers Occupationally Exposed to Formaldehyde Their conclusion was that their study supports the hypothesis that chronic exposure to formaldehyde induces symptoms and signs of chronic obstructive lung disease."
30. Then there was an article in the Archives of Environmental Health, 1982, Volume 37, pages 279 through 284. The author was Rolf Alexandersson. The title is Exposure toFormaldehyde: Effects on Pulmonary Function.
 "They found that exposure to formaldehyde fumes resulted in decrease in pulmonary function, specifically FEV1. Their conclusion was that it supported — the exposure supported an effect of formaldehyde in causing occupational asthma. They felt that smokers and non-smokers displayed similar changes in spirometry and nitrogen washout.
31. Dr. Campbell said that with those and other literature references he felt that formaldehyde had been demonstrated to be able to cause an occupational asthma. He then wanted to know if wood also had an effect, so he searched the literature on wood dust, and found articles. The first one was the British Journalof Industrial Medicine, 1987, volume 44, pages 53 through 56. The main author is Carosso. The title is Respiratory Diseases inWoodworkers.
 "They confirmed the observation that exposure to wood dust or some substance linked with woodworking can induce chronic obstructive lung disease. They adjusted for smoking, and showed that the effect occurred in both smokers and non-smokers."
32. In this study, workers handling MDF board had more symptoms of the upper airways, especially of the nose and eyes, than persons working with traditional fiberboard and pure wood. Airway symptoms were more frequent in both the exposed groups — both of the exposed groups and in the reference group. The frequency of health complaints concerning airways was higher; the sense of smell was poorer, and the frequency of nasal obstruction was higher with the exposed group.
33. In the Archives of Environmental Health, 1994, Volume 49, pages 465 to 170, in an article entitled RespiratoryConsequences of Exposure to Wood Dust and Formaldehyde of WorkersManufacturing Oriented Strand Board, the following appears:
 "[T]he symptoms of asthma were significantly higher in the exposed, compared to the unexposed, as well as lower respiratory tract symptoms. They looked at both smokers and non-smokers and found that the effect was greatest in the smokers. They found a significant difference in pre-shift and post-shift FEV1 and FVC values."
34. Based upon his review of Mr. Norris' testimony and on his medical records as well as the literature and his training and experience, Dr. Campbell rendered an opinion that Mr. Norris's exposure at Myrtle Desk to dust and other irritants described in his testimony, was a significant contributing factor in causing the lung disease (occupational asthma) that appeared in his medical records. And in rendering this opinion, Dr. Campbell testified that he took into account that Mr. Norris had a history of smoking cigarettes and the fact that there is no way to scientifically or accurately quantify the relative contribution of those factors. He also was of the opinion that, based on the duration of time that Mr. Norris was exposed to the irritants at Myrtle Desk after becoming symptomatic, Mr. Norris is going to have long-term asthma. And he testified that the occupational exposure at Myrtle Desk was a significant contributing factor to his disabling lung condition.
35. In his second deposition, taken after the Full Commission Order of 29 November 1994, Dr. Credle had this to say about causation: "In this situation, I think there would be no reason — no way to tell for sure what was causing his asthmatic condition; although, I think the fumes were clearly an aggravating factor in that."
36. Dr. Credle had the following to say with respect to occupational asthma's ability to disable:
 Q. by Robin Hudson: "Now, if — in Mr. Norris, if you assume that he had some underlying obstructive lung disease before he had these exposures —
A (Interposing) Right.
 Q — do you have an opinion as to whether superimposing an asthmatic condition due to occupational exposures on top of that would hasten or more rapidly result in a disabling lung condition?
A. I believe they would.
 Q. Okay. And only one other question. . . . Can an asthmatic condition be disabling?
A. Yes.
Q. In what way?
 A. I mean, it can — you can cease to be able to work and function with asthma.
 Q. Can it result in — is that because it results in a repeated asthmatic type of condition, or does it. . . .
 A. It can be either, but the amount of wheezing can it can be more disabling in an acute sense than chronic obstructive pulmonary disease, which is sort of a stable condition. Asthma, a lot of wheezing, people can't ventilate and can die from it. I mean, it can be very disabling. And if you can't clear the wheezing, the asthma, then it can be a permanent disability."
37. Based upon the expert medical testimony, the Full Commission finds as a fact that Plaintiff suffers from an occupational disease resulting from his employment at Myrtle Desk, that his disability is total and is likely to be permanent. The Full Commission further finds that Mr. Norris' work and exposure at Myrtle Desk placed him at increased risk for development of chronic lung disease than members of the public generally.
* * * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. The Industrial Commission must make complete findings on all issues upon which the plaintiff's right to compensation depends. Henry v. Leather Company, 231 N.C. 477,57 S.E.2d 760 (1950); Wood v. J.P. Stevens, 297 N.C. 636,256 S.E.2d 692 (1979).
2. The findings must cover all crucial facts raised by the evidence, and the Commission may not ignore competent medical evidence. N.C.G.S. 97-84; Harrell v. J.P. Stevens, 45 N.C. App. 197,262 S.E.2d 830, disc. rev. denied, 300 N.C. 196,269 S.E.2d 623 (1980). The cause must be remanded for additional findings when the Commission fails to make the proper findings. Moore v.J.P. Stevens, 47 N.C. App. 744, 269 S.E.2d 159, disc. rev.denied, 301 N.C. 401, 274 S.E.2d 226 (1980).
3. In occupational disease cases, the Courts have held repeatedly that the findings of fact must address both significant contribution or aggravation and causation, whichever is raised by the evidence. Rutledge v. Tultex/Kings Yarns, 308 N.C. 85,301 S.E.2d 359 (1983) In Dowdy v. Fieldcrest Mills, 308 N.C. 701,304 S.E.2d 215 (1983), the North Carolina Supreme Court determined that evidence of "distinct aggravation" of the plaintiff's obstructive lung disease by cotton dust exposure constituted sufficient basis of occupational disease as a matter of law to trigger the running of the limitations period. Id. at 705.
4. The Court of Appeals has frequently remanded occupational disease cases for failure of the Industrial Commission to make the required findings. In an early post-Rutledge decision, the Court of Appeals explained its interpretation of the requirements, which have been subsequently followed in other cases. Clark v. American and Efird Mills,66 N.C. App. 624, 311 S.E.2d 624 (1984); aff'd. per curiam, 312 N.C. 616
(1985); appeal after remand, 82 N.C. App. 192, 346 S.E.2d 155,disc. rev. den., 318 N.C. 413 (1986); motion to recon. den.,319 N.C. 672 (1987).
5. Plaintiff has fully met his burden of proof as enunciated in Wilkins vs. J.P. Stevens, 333 N.C. 449,426 S.E.2d 675 (1993) as follows:
 To insure this causal relationship between conditions of the workplace and the claimant's incapacity to work in the context of a COPD claim, it must be shown factually that claimant's "occupational exposure was such a significant contributing factor in the diseases development that without it the disease would not have developed to such an extent that it caused physical disability which resulted in claimant's incapacity for work." Rutledge v. Tultex Corp., 308 N.C. at 102, 301 S.E.2d at 370.
 In other words, it must be shown factually that but for workplace aggravation of the non-occupational disease there would not have been the same incapacity for work for which compensation is sought. Stated another way, if the same incapacity for work for which compensation is sought would have resulted because of the non-occupational disease itself, unaggravated by workplace conditions, there can be no compensation under the Act, even if workplace conditions, from a medical standpoint, aggravate the disease.
6. Prior to Mr. Norris' exposure to wood and chemical dusts and fumes working at Myrtle Desk, he was not disabled by any breathing problems, medical or otherwise. There is also no evidence that he suffered from chronic obstructive lung disease, asthma or any other lung condition prior to his employment at Myrtle Desk. It is also undisputed that Mr. Norris was exposed to significant amounts of dust and fumes from the wood and particles as well as the glues that held them together, and that he was a cigarette smoker until he quit in 1991. As Dr. Smith testified, "It's pretty obvious from what we've presented that the workplace definitely made him worse. It increased the progression of his disease and it really aggravated the, asthmatic component to his disease. He's definitely disabled totally. He probably had asthma and he just worked on through it, he's a pretty tough guy and he just kept on going with things, and then these exposures have just added to it to the point where he is just having chronic asthma that was untreated and it eventually developed with the chronic lung disease."
7. Plaintiff suffers from an occupational disease resulting from his employment at Myrtle Desk; his disability is total and is likely to be permanent. Mr. Norris' work and exposure at Myrtle Desk placed him at increased risk for development of chronic lung disease than members of the public generally. Plaintiff is entitled to compensation at the rate of $198.93 per week from 28 January 1991 and continuing so long as he remains totally disabled, and is entitled to medical treatment to the extent the same is reasonably designed to tend to effect a cure of, provide needed relief from and/or lessen the period of disability associated with plaintiff's occupational disease.
* * * * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of Deputy Commissioner Garner and enters the following:
AWARD
1. Defendant shall pay plaintiff, on account of his continuing and total disability, compensation at a rate of $198.93 per week from 28 January 1991 to the scheduled hearing date and thereafter, continuing at the same rate so long as he remains totally disabled. Such compensation as has accrued hereunder shall be paid in a lump sum, without commutation, subject to a reasonable attorney fee hereinafter approved. Defendants shall pay interest on the amount of such compensation as had accrued by the date of the hearing below from 28 January 1993 (the date of the hearing below) until paid and shall pay interest on all other amounts from the date due until paid. All of the interest is payable to the Plaintiff.
2. A reasonable attorney fee in the amount of twenty-five (25) percent of the accrued compensation benefits due under the above award is hereby approved for plaintiff's counsel, which shall be deducted from the award and forwarded directly thereto. For the balance of her fee defendant shall forward every fourth compensation check payable hereunder directly to plaintiff's counsel.
3. To the extent the same are reasonably designed to tend to effect a cure of, provide needed relief from and/or lessen the period of disability associated with plaintiff's occupational disease, defendant shall pay all reasonable and necessary medical expenses incurred as a result of the occupational disease when bills for the same are submitted in accordance with the Industrial Commission Rules.
4. Defendant shall bear the costs, including as part thereof, expert witness fees except for the second deposition of Dr. Credle, the cost of which shall be borne by plaintiff, and the deposition of Dr. Campbell, the cost of which shall also be borne by plaintiff.
 S/ ________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ________________ COY M. VANCE COMMISSIONER
S/ ________________ LAURA K. MAVRETIC COMMISSIONER